Good morning, Your Honors. My name is Cheyenne Awagi, and I'm joined by my co-counsel, Mr. Amazi, today. We're here for representing the mother of Mr. Hodge, the mother, the godmother, present today. Your Honors, I would start with a quick anecdote. When I went to university, I took a poetry class, and the first thing the poetry professor, Hemshmire, did was she brought a picture of a tree, and she told the class to describe the tree. And everybody turned in their tree, and she told us that everybody will describe it differently, because that's how the human mind works. That's why we're here today. In 2019, August of 2019, the government of Texas decided that they were going to send DPS troops, officers, to different cities to patrol. They were warned that this would be a disastrous situation, because those DPS officers do not live there, they don't know the people, and they don't know how it works in Dallas. Regardless, that's what happened. On August 17th of 2019, Mr. Hodge was in his own neighborhood, going to his house, where he took care of his grandma, who had Alzheimer's. He lived with her. He stopped at a stop sign. He did not use a signal, transit. The officers, the DPS officers, not the local officers, decided to pursue him. He got scared. He drove the car straight to his house. The video shows, and the reason we bring up the video is because that's why we're here, because this government brought in the video. In our complaint, we had claimed that basically Mr. Hodge, as he came out of his car, was told to show his hands. And when he complied, the officer started shooting. And that, what we believe, is what the video shows. The other side, the government claims that Mr. Hodge was pointing the gun at the officer. We do not believe the video shows that. We believe that's what the fact finders. So what ended up happening here, in our third motion to dismiss, the court basically adopted the narrative of the government and say they agreed with the government that the video clearly, clearly shows that we, the plaintiff, are blatantly contradicting the evidence. We disagree. We are here so that the motion to dismiss that was granted is overturned and basically we are locked into discovery. Did the district court invite limited discovery of the facts such that it would be appropriate to consider the video? No, no, Your Honor. I thought the district court specifically invited limited discovery of facts at the record on 172. Is that not right? Your Honor, it is not my understanding that they allowed us to do any discovery. It is... But was going to allow the video to be discussed. To what extent did you object or say, Your Honor, we shouldn't be getting into the video? We did a motion to strike. And this is the third. We did a motion to strike and in one of the conferences with the judge, we were told, and unfortunately it's off the record, but we were told that we should not, we should reconsider doing a motion to strike at the third motion to dismiss that the government had filed because we would know what the results will be. And frankly, we didn't understand that, what she meant by that, but we did not do the motion to strike on the third one. Regardless, Your Honors, even if the video is seen by the court, it is as clear as mud. For the judge to say that the video is clear, if you look at the pictures that the judge has included in the opinion, even those pictures are not clear. We live in 2023. There are forensic apparatus that we can use to frame by frame clear these pictures. None of that has done. If discovery was allowed, which it should have been, we could do that. We could depose the officers who got there afterwards to see what they were told. You're saying, if I understand you use the word clear, I just want to be sure I understand. You're saying that the video clearly favors your client, whereas the district court said just the opposite? I don't want to put words in your mouth. Yes, Your Honor. We're saying that the video is unclear, but it does favor our client because in the totality of the circumstances, our client seems to be complying with the officer's orders. The officer runs up the driveway, screaming at our client who's exiting the car to show his hand. I personally think when I've listened to the video, I think he's also saying, put up your hands. It's either or. Regardless, our client seems to be coming out of the car complying. And it is completely unclear where the gun is pointing, if the gun is in his hand. But they're saying it's clear as day. It's not. As a matter of fact, Attorney Jones' office calls us delusional. That's how far they went in their pleadings, that we have delusive assertion. Is it clear that your client, the decedent, was holding the gun? Your Honor, we understand the gun was found next to him. Do you believe it's clear that when he's holding that, that that shiny object in his hand? That shiny object, Your Honor, can only be clear. If I were to say that, I would be saying that without discovery. Again, we can actually, they had a duty before they even not disciplined their officers to get a clear video of the bodycam. They did not do that. We have not had that something that I believe is murky. But let's assume. So you believe it's murky as to whether he's holding the gun at all? Your Honor, if I were to say in the video that the shiny object is a gun, I would be basing it on my common experience that something shiny is in his hand. But regardless, the standard is not shiny, standard is pointing. The question would be whether the gun is pointing at the officer. And in the totality of the circumstances, when the officer says, show me your hands, and the man is complying, and the officer starts shooting, that can only be said as a shout and shoot policy, which is not the policy of Dallas County, obviously, or the state. You do acknowledge, I assume under Scott v. Harris, that we can look at the video even as an appellate panel and draw our own conclusion about what it shows. We understand that, and we understand that Your Honors have looked at the video, or at least have had it brought to your attention, and we understand that. But Your Honors, I would urge you to kindly use the scientific apparatus we have available to our, you know, in 2023, because this wasn't there 10 years ago. And we have a duty, I believe, as lawyers to bring this to attention, that in discovery, we can do that. If you also adopt what the lower court said based on what they're saying, we go back to my poetry professor, you're drawing the tree as you see it, just as the lower court did. Not only that, in the motion to dismiss, plaintiffs should be seen, all facts should be seen in favorable to the plaintiffs, unless something blatantly, blatantly contradicts it. A shiny object does not blatantly contradicts that claim. It could affect how MTD is handled in that district, Your Honors, and that's so important. It really can. I'm not saying that we may not lose at MSJ, but I'm saying we have to get there. Discovery is so important in this, in this case, like every case. It's as clear as mud that video, and we, we hope that you do not adopt what has been sent up to you and allow discovery to go on and allow, then the AG can bring an MSJ if they need to. I just want to be sure I understand. I think you've said it more than once, but I want to be precise. The additional discovery that you're talking about is the frame by frame analysis. Experts, experts, frame by frame analysis, they'll clear it up. They can clear it up. They have that technology. They should have done that. Secondly, Your Honor, we can also have some depositions. What, what, what would an expert say? What, what would an expert testify to as, as an expert? That would be helpful. Well, Your Honor, if we were just to clean up the frame by frame, and if it shows that the gun is pointed, there's a gun in the hand of my client, or the decedent, Mr. Hodge, and it's pointed, then we don't have a case. We have a case because it was murky. But for the other side to say it's not murky is, frankly, I mean, Your Honor, if you look at the, the, uh, and I know, uh, you know, I'm not suggesting, uh, to tell you how to do things, Your Honor, but the newspaper reports that came out after the incident, none of them said he was pointing the gun. That was their narrative. And your, and your time has expired. Yes, sir. Thank you. Thank you. Mr. Almazi. Good morning, Your Honors. May it please the court. Uh, Blair Almazi on behalf of the appellant. I do want to touch briefly on a question Your Honor just, uh, posed to Mr. Elahi regarding what would an expert testify to in a case like this, specifically because this ended at the motion to dismiss stage, and we weren't allowed to go into that extensive discovery. If we were to take some of, you know, although the facts were to be viewed in favor of plaintiff, or in the light most favorable to the plaintiff, if we are to take the state's position that a weapon was seen, or even that a weapon was pointed, what would an expert testify to? The quickness with which an officer sees a gun, notices a gun, and reacts to it. If Your Honors have had a chance to view the body camera footage, you see that this all happens extraordinarily quickly. It is within a matter of seconds, and in fact, even within a one-second frame, you see changes in movement. In a case like that, an officer's response time, I think, could be fairly evaluated by an expert as to how long does it take the brain to register that there is a weapon, and how long does it take for an officer to react with using deadly force. And this court found in Trammell v. Frouge that the quickness with which an officer resorts to the use of deadly force mitigates the finding of reasonableness. And so for us not to be able to get into that discovery, not to be able to move past the motion to dismiss stage, I believe severely, you know, it hinders our ability to present this case either as somebody's actions or unreasonable. Did you make the same argument to the district judge about not only the need for discovery, but specifically an expert to discuss response time? Your Honor, I don't know that the expert testimony regarding response time was specifically noted in any of our motions to strike or brief on the motion to dismiss. We did, of course, mention that we did want discovery in this case. Because generally just to request that, hey, we want some discovery isn't sufficient. You need to show what kind of discovery you would be asking for. Yes, Your Honor, of course. And I mean, outside of just expert testimony, obviously we would want to have the ability to impose the officers on at what moment do you allege you see a gun. There are two different officers here who did fire their weapons, both of the athletes, and they were on different sides of the vehicle. And so, you know, there is a serious question as to whether one of the officers ever noticed a weapon in Mr. Hodges' hand at the time he began firing, or whether he just began firing in response to his partner firing his weapon. And Your Honor, just again, just to go to Graham versus Conner factors here, obviously we're dealing with disparity of the climate issue. In a case like this, the troopers allege that our client failed to use his turn signal at a stop sign, arguably a very low class scene misdemeanor offense. A pursuit ensued, which we acknowledge. Well, under all of the case law, even a minor infraction like that is enough for a stop. Yes, Your Honor, we agree. And we don't acknowledge, or we're not saying necessarily that the officers didn't have the right to pursue. You know, if they saw an alleged traffic violation, they have every right to pursue. But the question becomes, in that pursuit, the officers obviously exited their vehicle after the pursuit, weapons drawn, and rushed the driveway. And we believe they had every intention to resort to deadly force immediately after putting their car in the park. But under any theory that you have, are you not stuck with the proposition that your client got out of the car with a weapon in his hand? Your Honor, again, the video is unclear, but if there was a weapon in his hand, whether it was pointed at the officer, we believe this. I understand that, but the man gets out and he is charged. Your Honor, I understand that point, and we would just resort to, again, the standard is the officer in imminent danger here. And, you know, there are other cases where a suspect is armed, a weapon is not being pointed at the officer, where the use of force would be unjustified. I thought your opposing, I mean, your colleague said that it's not established that he had the gun in his hand. And, Your Honor, I'm not saying it's established. I'm saying it's unclear. I thought that's the whole point, that you don't know whether he had the gun in his hand or not. And so that's why, because the video is not clear on that, and so that's why motion to dismiss is not appropriate. Absolutely, Your Honor. So it is unclear, but what I was answering to, Your Honor, was that even if, arguendo, there was a gun in his hand, not being pointed at an officer does not necessarily mean that use of force in that moment would be justified. But we're not here to say that he had a gun in his hand, that the video clearly shows that. And we believe, especially at the motion to dismiss stage, where the fact— Where was the weapon found? Near his body. I'm sorry? The weapon was found near his body. Oh, near his body, yes. I'm sorry, Your Honor. He was out of the car, and when he was shot, and he went down, and the weapon was beside his body. Yes, Your Honor, and I'm not sure where exactly it was, but the officers do make a comment that there's a weapon. Well, okay, let's say he's not—somebody comes out of the car, he has a weapon. Is that—the officer must wait to see what he does with it? Yes, Your Honor. I mean, unless the officer feels immediately an imminent fear of bodily harm, I mean, that's a different situation. But the fact that someone is armed does not necessarily mean that use of force is automatic. If someone is, quote, armed, they can have a weapon in the car, or armed in that sense. But when someone has a weapon in their hand, that's cutting it pretty thin. Understood, Your Honor. Does the complaint say that he had a weapon in his hand? The complaint said he was armed. Your complaint says he's armed? Yes. Okay, so you've—doesn't that mean that we have to say he had the weapon in his hand? Your Honor, we don't know that it was necessarily in his hand. I mean, we based that off— But you said he was armed. Well, armed, it was found near his body, so whether— So you're not contesting that this was a throw-down gun or something like that, then? Your Honor, we have no business— In the complaint. —that the gun was planted or anything like that. If a weapon was found near his body, we don't know where it would have been on his person. But to quickly address Your Honor's concern about just having a weapon when use, of course, would be appropriate in that context, we do cite a few cases. And while not directly on point with our facts, there are cases where someone is in a mental health crisis, holding a screwdriver, going towards the officers, and, of course, deciding— summary judgment in that case would be appropriate. And we believe in a case like this where there's unclear video, that we should have been allowed to do discovery and that there was enough to at least get into that process and not get kicked out on motion to dismiss. Your Honor, I don't understand what the discovery might—further examination might disclose. And from the film itself, how do we improve the film? I'm sorry, Your Honor? How do we improve the film? How do we improve the film? How do we improve it so we get a better image than we have now? Well, Your Honor, I mean, I know there are experts out there who can clear up hazy footage, especially in the body camera footage context where we are not dealing with, you know, HD technology. But I believe if the expert could clear that video up and we could have the ability to ask officers about each second of that video, when did you allegedly see the gun? When did the partnering officer see a weapon being pointed at his partner? Those are things we would want to clear up, obviously. All right. Mr. Omazi, you've saved some time for rebuttal. Thank you, Your Honor. Mr. Lindsey? Thank you, Your Honor. May it please the Court. My name is Christopher Lindsey. I represent Texas State Troopers Joshua Engelman and Robert Lippin. Your Honors, this Court should affirm the District Court for three independent reasons, the first of which is the video. And it's important to note what exactly the video shows. Trooper Engelman's video, and this obviously is disputed, especially played at about 30%, shows Chasten Haught get out of his car and raise a weapon very clearly at Joshua Engelman. I believe it also shows that he takes a shot, but I think the District Court took the better part of valor in not accepting that. It doesn't matter, though. Then if you go to Robert Lippin's video as he arrived behind Trooper Engelman, it shows Chasten Haught not putting up his hands. It shows Trooper Engelman on the ground firing on Chasten Haught, and it shows Chasten Haught drop a gun as he goes to the ground. And then that same video shows the gun within arm's reach of Chasten Haught as Robert Lippin shows up. This video... There's two videos? There's two videos, Your Honor. One, Joshua Engelman, who was the first on the scene, who was the first to exchange fire, and Robert Lippin was right behind him coming around the house. Let's talk about whether or not we can look at video in this case at all. Yes, Your Honor. On a motion to dismiss where the video is not cited in the complaint. In the other case where we've allowed it in a motion to dismiss, the video was incorporated into the complaint. And so if it's not part of the complaint and we're part of the motion to dismiss, do you believe this was converted to a summary judgment by the district court or something that would give us authority to look at things outside the complaint? I don't believe it should have been converted, Your Honor. The standard for this was laid down in the Supreme Court's case in Scott v. Harris.  Motion to dismiss is you look at the four corners of the complaint and anything attached to the complaint. And so normally you can look at the video because we're dealing on summary judgment or because they've incorporated it into the complaint. This is a civil procedure question I'm asking you. Yes. Yes, Your Honor. So how can we look at this video at all? I know Scott v. Harris says we can look at a video when it's properly been considered, but on a complaint, how can we look at it unless it is converted to summary judgment? I believe the same question was also taken up in the Sports Harmon case and perhaps also Harris v. Service. But the narrow question is whether the video blatantly contradicts the allegations. No, the question is whether we can look at something outside the complaint to decide this case. That's the question I'm asking. I understand your question, Your Honor. And the answer to that question is yes. Based upon what authority gives us the right to look at something outside the complaint? That precedent that we have that generates from Scott v. Harris and has gone down through this court's precedent. Are you saying Harmon and Harris are motions to dismiss cases where there is no attachment to the complaint and they still looked at the video and that was blessed? I cannot say that with 100% certainty. Okay. Are you saying that there's any such case? I believe there is, Your Honor. What I'm saying is the standard is if it is a government-supplied video and it directly contradicts the allegations, then it can be used in a motion to dismiss. But you don't know where that authority comes from? It comes from that line of cases, Your Honor. Because you get the point that you don't look outside the complaint normally. I do, Your Honor. And so then we say, oh, well, did everybody agree that we would look outside the complaint and the district court converted and made everybody... Do you believe the district court converted this to summary judgment to look outside the complaint? I don't, Your Honor. Okay. And I would also point out, however, that the video itself is not being challenged. There was no pending motion to strike when the district court ruled in this case. There was an original motion to strike and then there was an amended complaint. We ended up filing three motions to dismiss, if I remember correctly. And at that time, there was no motion to strike this video. The only quibble here is about the quality of the video, not the use of the video. So that question was not before the court. I thought the first gentleman who argued on your friend on the other side said that there was a lot of quibbling about whether they should be looking at the video. Not the admissibility of the video, simply what the video shows. Oh, I thought he said he originally did contest. I guess you're saying those previous motions to strike, they're not... He originally contested, then he amended his complaint. We filed another motion to dismiss, including the video, and he did not move to strike the video again. Okay. The second reason this court should affirm is because even if you ignore the question about whether the gun was pointed at the troopers, as this court has discussed, this court's case law still says that it was reasonable to use deadly force in the circumstance. And I would point to several cases, starting with this court's decision last year in Wilson v. Bastrop County, where there was, again, a car chase. Suspect emerged holding a gun and fled. At one point, lost control of the gun, retrieved it, and deadly force ended up being used as that suspect was about to escape into a tree line. This court found that the question of whether it was ever pointed did not matter. It was a matter of whether it was reasonable to perceive that that person could have been a deadly threat by holding that gun. What if we can't tell from the video that he's holding a gun? Because all it's, it's just a reflection and you can't see any outline of a gun. And so you don't know whether it's a shadow and a reflection, or what if you can't tell? Assuming that hypothetical, which we absolutely do not conceive, but assuming that hypothetical, what this court can do is rely on the admissions in both the complaint and in appellant's briefing that Shastin Hodge emerged from the car possessing a gun. What about the second video? The second video would would establish that, would it not? It would, Your Honor. The second video very clearly shows Shastin Hodge dropping the gun, and at the time that he became deceased, that gun was still within arm's reach, within inches of his hand, and the gun is very clearly displayed on the ground. And then you have that you have the complaint that says he was armed. Yes, Your Honor. And both the original brief and the reply brief both say that and has been conceded here at oral argument. Wilson cites this court's Ramirez decision, Ramirez v. Nolton in 2008. This is yet another one, another car chase. The suspect emerged holding a gun, never pointed it at the officers, and this court found that deadly force was justified because officers don't have to wait until bullets are downrange, until they are confronted with the barrel of a gun before using deadly force. Finally, this court can also rely on the second prong of the qualified immunity analysis, and that is settled law. Now, the appellants have taken a stab at Garner, Bexar County v. Lytle, and the Cole case. The first two, Garner and Lytle, this court has found that those cannot be used to settle law. Those are at a high level of generality, fact-wise, and especially after the Mullenix decision, they just cannot be used to satisfy that prong. The Cole case, highly contested in this court, but obviously good law, very distinguishable from this case because the subject in that case, just to remind the court, was a suicidal individual who was walking through a neighborhood holding a gun to his own head. There was a fact dispute about whether that situation ever changed, which is why it was remanded. The gun was a known circumstance. They were not trying to take that individual into custody. The gun was never produced as a surprise to the officer. They were not chasing him. He was not a fleeing felon. It is very different factually from this case. I'm sorry, back on your, were you saying that Garner and Lytle are not good law after Mullenix? No, I did not say that, Your Honor. Okay, that's what you were saying, you're saying they're at a high level of generality for this case today? For this case, Your Honor, and I apologize if I misspoke. I'd point you to, I believe it was either footnote three or footnote four in the Harmon case where this was pointed out, that you can't just point to one of those cases and say, oh, this is a fleeing felon, therefore it is clearly established that you cannot use deadly force. They certainly could be used in very specific circumstances where, in the case of Lytle, you are firing on a car that's driving away. This is not that case, or Garner. You have a challenge to what the film really shows, then why should this, can it really go off without at least getting into the determination of fact on a summer judgment instead of motions of dismissal? Summer judgment allows people to try to develop the record to see whether there is some genuine issue as to the, about the gun, whether he had it at what time or moments or whatever. I was pressing counsel opposite the seat as to what the film, what they claim the film might show, but procedurally, it seems pretty obvious that a district court can't, if there is a challenge to what the thing shows, certainly should not just take that and motion to dismiss as a procedural matter. What do you say to that? If there's a reasonable challenge, if, as they say, the video, and by the way, if the only issue before the court is whether the gun is pointed or not, or whether the gun exists or not, if there was a reasonable challenge, if you look at the video and there is any question about whether it shows what we say it shows, then yes, absolutely, we need to go to the MSJ stage. But first of all, there is no reasonable dispute about that. The video is clear enough about what it shows, and also that whether or not the gun is pointed is simply not the only issue. It is conceded that the gun existed and it was in the possession of Chasten Hodge. And so there is no reason to go on and essentially abrogate these officers' qualified immunity and make them go through the rigors of litigation when it is obvious at the pleading stage that they were justified in using deadly force. Do the officers dispute that he did put his hands up? That they absolutely disputed, and that is shown on the second video. As Trooper Liveden comes around, it very clearly shows Chasten Hodge standing over Joshua Engelman. His hands were not up. You cannot see what his hands are doing, but he is standing over Joshua Engelman, sitting on the ground, defending himself, and then when Chasten Hodge goes down, he drops the gun. At no point are his hands up in any sort of surrendering motion. And you can also look at the original video, Joshua Engelman's video. His hands definitely go up, but they only go up to display a gun. Your Honors, just to show how far we are from settled law in this case, I would point you to this Court's 2019 decision in Valderas v. City of Lubbock, which is the closest I can find to what the appellants are suggesting here. This is a case where police were approaching a subject who was the subject of a sting. When the arrest team was approaching this individual, he didn't know they were police officers at first, and he produced a handgun from his waistband. He was then advised by one of the undercover officers that these were he managed to discard the handgun before the arrest team opened fire on him and qualified immunity was granted to that arrest team because they could not be sure in that split-second moment that that handgun was not going to be used against them. Even if we were to concede, which we don't, that Chasten Hodge got out of that car holding a gun, and he did not intend to use it, and he intended to surrender and discard it, still, these officers had reasonable belief that that had no reason not to believe that that gun would not be, at some point, used against them, and so they are entitled to qualified immunity. I see I have plenty of time left, but if the panel has no questions for me, I'll cede back the rest of it and ask that you confirm the district. Thank you, Mr. Lindsey. Thank you, sir. Mr. Amazi, you've saved some rebuttal. Thank you, Your Honor. I believe many of the cases cited by opposing counsel, while the law is there and while we do establish those cases obviously exist in our precedent, many of those cases are dealing with summary judgment. They are not dealing with motion of dismiss where we haven't even been able to dig deeper into these facts, and so, you know, proposing counsel to rely on that, I believe, is, you know, not very helpful in determining should we be allowed to incorporate that video at the motion of dismiss stage, even though it is not in the four corners of the complaint, and obviously, at summary judgment, there are different standards, and we would have had the ability not only to depose the officers, but to hire experts and to, you know, get expert opinions not only about the video, but on whether an officer's what do you want this court to do? Well, we want this court to remand this case back and allow us to proceed past the motion of dismiss and to discover. We believe, you know, for opposing counsel to say that no case precedent exists, you know, we cite Nicole versus Carson here, and while we understand Tennessee versus Garner is an easily citable case here, does not mean it's not good law to say that officers are not allowed to shoot at fleeing suspects when there is no imminent threat to that officer or to others, but in Cole, we're dealing with a case of a suspect who is on foot, does have a firearm, is moving away from officers, but in that case, which I believe was also decided at summary judgment, the district court ruled that there was a material dispute as to whether the suspect was holding the gun, was pointing it at his head or pointing it at officers, and so that's a big difference here for them here. The district court hasn't ruled that in this case. Yes, Your Honor, and again, we understand that was the big pivotal issue in that case, whether the district court had made a ruling and whether or not we had to give or should give deference to that, and that's what was the big issue in that case. Right, and Your Honor, you know, our position still is the video. One thing about, you know, about Cole, the officers did testify that, or it's heard that, Cole had lowered the weapon to shoot. Now, the difficulty was that later, medicine came in, the examination came in two months later that showed that the gun was pointed to his temple, and that had been lowered. Yes. That's the weather. However one may assess that those were the facts that happened, and that's a bit of a different problem, because there there was just a question of whether the, it's just a very different kind of factually. Ultimately, there was no dispute about what happened about the gun. Your Honor, and we understand this is a fact-intensive analysis, and that different obviously, you know, even favorable cases will have different facts, but those cases were allowed to proceed past the motion to dismiss stage. In our case, again, we believe the video should have never been allowed in, and that it was not so contradictory as to somehow become incorporated in our complaint. Thank you, Your Honor. Thank you, Mr. Almazi. Your case and all of today's cases are under submission, and the court is in recess under the usual order.